FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **DIANE ALMOND-WARD** | 2014 JUN 23 P 4: 06 |
| 7310 Hazelwood Court | |
| Warrenton, VA 20187 | CIVIL ACTION CLERK US DISTRICT COURT |
| | ALEXANDRIA, VIRGINIA |
| **Plaintiff,** | |
| | |
| **v.** | **NO.** 1:14CV774 |
| | LO/TRJ |
| **LOWE'S HOME CENTERS, LLC** | |
| 13000 Gateway Center Drive | |
| Gainesville, VA 20155 | **JURY TRIAL DEMANDED** |
| | |
| **SERVE: Register Agent** | |
| **Corporation Service Company** | |
| **Bank of America Center, 16th Floor** | |
| **1111 East Main Street** | |
| **Richmond, VA 23219** | |
| | |
| **Defendant.** | |

## COMPLAINT

### Nature of the Claim

1.     In this action, Plaintiff, Diane Almond-Ward, an African-American female, seeks
to recover damages under Americans with Disabilities Act, as amended (42 U.S.C. §12101 et
seq.) ("ADA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, for wrongful
termination, and for violation of the Virginia common law tort of intentional infliction of
emotional distress. This was all caused by Defendant, Lowe's Home Centers, LLC. ("Lowe's)
unlawful employment practices, resulting in an illegal discriminatory environment and
discrimination in employment, based on race, sex and disability or medical condition, suffered
by Plaintiff who was adversely affected by Defendant's unlawful employment practices. After

1

failing to get Lowe's to address the situation, Plaintiff filed charges with the EEOC and was ultimately fired in retaliation because she wanted Lowe's to address the situation.  As a result of the invasive and insufferable working environment maintained by Defendant, Plaintiff has suffered and continues to suffer emotional distress.

## PARTIES

2.      Plaintiff, Diane Almond-Ward ("Plaintiff"), is an adult, female person who resides in Warrenton, Va., Fauquier County, VA 20187.  At all times pertinent to this action, Plaintiff worked at Lowe's Gainesville, VA facility.

3.      Defendant, Lowe's ("Defendant"), is a publicly traded company, originally incorporated in North Carolina.  Its store in question is located at 13000 Gateway Center Drive, Gainesville, Va. 20155.

4.      At all relevant times, Employer has continuously been engaged in an industry affecting commerce within the meaning of Sections 701(b), (g) and (h) of Title VII, 42 U.S.C. §§2000e (b), (g) and (h).

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over Plaintiff's claims for relief under  28 U.S.C. §§1331, 1337 and 1343, The jurisdiction of the Court is predicated on 28 U.S.C. § 1331, 1337, 42 U.S.C. § 2000e-5(f) (3) and 28 U.S.C. § 1343(a) since those claims are based in part on violations of Section 706 (f)(1) and (3) of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-5(f)(1).

6.      Plaintiff invokes the supplemental jurisdiction of this Court to consider related claims under the common law of Virginia pursuant to 28 U.S.C. § 1367 because the state claims

and federal claims are so interrelated that they are the same case or controversy under Article III

of the United States Constitution.

7.     This action is brought after timely dual filing of Charges with the U.S. Equal

Opportunity Commission ("EEOC"), the Virginia Human Rights Commission ("VHRC") and

the Prince William County Human Rights Commission. Moreover, this action has been filed

within ninety days from Plaintiff's subsequent receipt of a "right to sue letter" dated March 31,

2014.

8.     The proper venue of this action under 28 U.S.C. Section 1391 (b) and (c) is in this

Court, as Plaintiff was working in and is a resident of this Commonwealth, and was based out of

Defendant's facility in Gainesville, Virginia, which is within the Eastern District of Virginia.

### BACKGROUND FACTS

9.     After previously having worked for Kohl's as an overnight manager, on

November 8, 2004, Plaintiff was hired by Defendant as a paint department manager in its

Gainesville store. During 2005 she made a lateral move as an electrical department manager.

10.     After seeing others with less experience or no experience whatsoever being

promoted, in February of 2006 Plaintiff emailed the store manager and district manager about

promotion opportunities. During that period she also spoke with the store HR Manager John

Lieberman about what to do to obtain a promotion. He told her that promotion was based on the

top 3 interviews with the store manager. Plaintiff protested that she was never given an

opportunity for an interview by the store manager.

11.     Sometime thereafter in 2006, Mr. Tony Caferella, then Operations Manager in

training, was asked to assist Plaintiff with a millwork customer. Plaintiff asked a question in

front of the customer and Mr. Caferella became rude and said that Plaintiff's question was dumb

3

and that she should have known the answer. Having witnessed this, the customer was so appalled that he did not want Mr. Caferella's assistance. Plaintiff told Mr. Caferella never to disrespect her in that manner again. Mr. Caferella was subsequently moved to the Manassas Lowe's store as an Operations Manager.

12.     Starting in 2007, Plaintiff was diagnosed with breast cancer, Stage I. She had chemotherapy, radiation, a biopsy and lumpectomy. She was out of work from May to September on unpaid leave. After September 2007, while she was working, management would not accommodate her with respect to the need for treatment. To the contrary, knowing full well of her condition, Store Manager Tony Renya would change her work schedule, disrupting medical appointments and treatment. He insisted that Plaintiff take vacation for treatment.

13.     In September 2008, another employee named Karri Colvin, an Administrative Zone Manager, made a racist comment at the customer service desk in front of others who included employee Karla Osuna. Plaintiff was told by Ms. Colvin that Plaintiff was "too ghetto" to know the answer to a question that Tony Togan had asked Plaintiff about two-sided copying on the copying machine. When Plaintiff asked her why she would say such a thing, she said "I don't know....because your shoes and shirt always match." This was all witnessed by a third employee, Karla.

14.     On November 15, 2008, Plaintiff complained to Karri Colvin about being assigned an excessive number of store closing shifts, Karri Colvin was was editing the manager schedule at the time. Ms. Colvin told Plaintiff that she was "being screwed because she was black." Tony Renya, Store Manager, was sitting in installation-sales office. Plainly able to hear the comment, he never uttered a word. Another Installed Sales Manager, Cindy, screamed "Karri you can't say that!" Ms. Colvin's response was, "Yes I can, that's Diane." Plaintiff wrote

4

to the District HR Manager Laura Schleff about this incident.  Her response was to instruct

Plaintiff to continue to talk to Ms. Colvin because she did not want the situation "to seem like

retaliation." Despite Plaintiff's complaints to management about what took place, nothing was

done to rectify the situation.

15.     In the summer of 2009, residual cancer cells were discovered with the need for

prompt breast removal.  This necessitated Plaintiff's being out from work for two weeks.

16.     On February 21, 2010, after receiving a telephone call from store associates

looking for an "NFL" brand paint color, Plaintiff came to the paint department and scanned the

computer attached to the paint machine and found the term "NIGGA BLACK" entered therein to

describe a particular paint.  Plaintiff reported the incident to management including information

on an individual she suspected was behind the outrage.  Management said that there would be an

investigation. This did not take place.

17.     On July 29, 2011, Plaintiff complained to the District Manager and District HR

about Tony Renya's inappropriate behavior directed at Plaintiff over a schedule rotation. Mr.

Renya threatened Ms. Almond-Ward by saying that if this was how she would react, that the

minute she failed, he would write her up.  He said that he would make Plaintiff's life hell and

that "You won't last a month."   As a result, Plaintiff's schedule thereafter would be frequently

changed without notice. Moreover, Mr. Renya would never accommodate Plaintiff's necessary

medical appointments. The result was that she had to always schedule them on her days off.

18.     Between April and July, 2012, Plaintiff heard statements from the store manager

about denying promotions to another African-American worker, whom the store manager said

would never be promoted.  Plaintiff later heard another manager complain about a female

African-American worker who was doing lifting work in the aisles while other employees

watched. After she protested this, as well as the tirades from an assistant store manager who

kicked in the door and screamed over a meeting being conducted three to four minutes late, the

manager threw his vest on her desk to protest the fact that she took her concerns to Lowe's

Marketing Director. In retaliation, Mr. Renya instructed another associate to continually page

Plaintiff and to tell Plaintiff that Mr. Renya was "getting pissed off." Then other employees in

the store told Plaintiff that they could not understand why she was continually being paged. In

further retaliation, the store manager wrote her up for not performing an inventory, that she had

in fact performed. At the time, he scolded Plaintiff stating: "You are not my equal."

19.    Plaintiff complained to her superiors about the issues raised in paragraph 18

hereof, including speaking with Will Fenne on July 4, 2012 in detail about what Plaintiff

considered to be improper "good ole boy" behavior. Mr. Fenne responded to Plaintiff that Tony

Renya and Tony Caferella indeed were good ole boys who had been with Lowe's and had not

accepted change.

20.    On July 19, 2012, Plaintiff filed an EEOC intake questionnaire complaining of

unlawful discrimination, retaliation, and a hostile work environment, and was shunned at the

workplace thereafter.

21.    On August 2, 2012, Plaintiff was told by Tim Linch, Assistant Store Manager

about certain male bonding meetings of assistant managers held by Mr. Renya and a plot to spy

on the HR Manager and thwart her efforts at the workplace. Mr. Linch said that Mr. Renya said

the following about Plaintiff "Since Diane won't bend, I will break her." He also told assistant

managers not to discuss store work-related information with her. Mr. Linch told Plaintiff that

when she would come in during such meetings, they would be silent because Mr. Renya so

instructed them. Finally, Mr. Linch told Plaintiff that at one such meeting Mr. Renya announced that "Diane is as worthless as a goldfish with tits."

22.     On August 6, 2012, Plaintiff filed a discrimination charge with the EEOC, for race discrimination, discrimination based on medical condition, as well as gender discrimination.

23.     The "goldfish with tits" comment, had especially dramatic and damaging repercussions for Plaintiff, given her breast cancer experience and having lost a breast. The result was that Plaintiff talked to a psychiatrist once a week and went on FMLA leave from August 11 through September 30, 2012, separating herself from the workplace environment and hoping that Lowe's would address the situation. Initially one manager suggested that any such comment was just a joke.

24.     On October 6, 2012, Tony Renya made changes to the posted schedule and switched Plaintiff's days off without notifying her. Plaintiff reported the switch to the regional employment relations manager.

25.     On October 2, 2012, and again on October 11, 2012, Plaintiff met with Tanya Morning, Defendant's Regional Employee Relations Manager, about Mr. Renya's meeting and comments. She told Plaintiff that three other managers had heard the "goldfish" comment and instructed Plaintiff to correspond with her only and not to communicate with others, including Mr. Renya. During their conversations, both Plaintiff and Ms. Morning were brought to tears over the incident. Moreover, Ms. Morning admitted that Lowe's had dropped the ball concerning its investigation of both the paint incident and the comments by Karri Colvin about Plaintiff.

26.     On November 13, 2012, Ms. Morning called Plaintiff and informed her that the investigation was complete. She said that she was not at liberty to tell specifics. However, she

7

said that Renya was not going to be moved. Plaintiff said that she felt that she was left in a pit of hell.

27. During a manager's meeting on November 26, 2012, a black flooring associate was singled out for criticism. Plaintiff objected to this individual's being given all of the grunt work while white associates watched. Plaintiff stated that this was discriminatory. The HR Manager Ms. Tracy Herrman was also at the meeting and indicated that this was discriminatory.

28. On December 11, 2012, Ms. Herrman apologized to Plaintiff in person for not conducting an investigation about the paint incident. She said that a key suspect had conveniently called out the following day and they never got him to write a statement.

29. On December 12, 2012, Plaintiff spoke with Ms. Herrman on the telephone who again apologized for failure to investigate the paint incident.

30. On December 14, 2012, Plaintiff was called into the office of Mr. Renya with Mr. Will Fenne present. Plaintiff was presented with a performance write-up for not doing a daily safety review (DSR), safety walk on December 8, 2012. Plaintiff reminded them both that on this particular day there was a malfunction of the building alarm that precluded the work as requested. Plaintiff told them that she felt that she was being "set up". Accordingly, Plaintiff refused to sign the review. Shortly thereafter, Mr. Renya insisted that Plaintiff leave the building.

31. After speaking with Ms. Tanya Morning, who told Plaintiff that she could stay in the building that day, Plaintiff did so and was in the process of sending an email requested by Ms. Morning, when Mr. Renya sat down next to her and demanded to know what she was doing and if she was working. Plaintiff said that she was sending an email that had been requested.

8

32.     On December 19, 2012, Plaintiff was terminated from her employment by Mr. Robert Yeatts, Regional Market Director.

33.     At all times, Plaintiff tried to get Lowe's to deal with her complaints in house to use the incidents complained of as a learning tool for all of those effected.  Plaintiff was repeatedly rebuffed and ultimately fired in retaliation for her EEO complaint and for her persistent efforts to have the EEO-related matters addressed.

34.     Defendant's website page entitled "About Lowe's" states that the company was founded in 1946 eventually transforming itself "from a small hardware store to the second largest home improvement retailer worldwide" with more than 1,830 stores in the U.S., Canada and Mexico.  It was incorporated in 1952 in North Carolina and has been publicly held since 1961.  Prominent in its website is the touting of "social responsibility" including stories of helping bring a service dog home and delivering tornado relief.  A message from its CEO states that "As a home improvement company, Lowe's is called to serve.  This call to serve is no small task, and it's more than just corporate responsibility."  Emphasizing various social programs including Habitat for Humanity and concern for the health of its own employees, Robert A. Niblock, Chairman, President and CEO says, "And you'll understand how our commitment to inclusion and diversity of thought is changing the way we do business; how our zeal for safety in the workplace is changing the way employees think about Lowe's; and how our pioneering spirit is changing the way we help our people develop their careers."  He then asks the rhetorical question, "Why come to work at Lowe's every day?" The answer is: "We ask ourselves that question often, because the answer reaffirms our commitment to the culture we're continuing to build.  Above all else, Lowe's helps people love where they live.  For nearly 70 years, we've served customers by remembering we do so much more than sell products.  We help people

achieve the dreams they have for their homes and communities. From our humble small–town hardware beginnings to a FORTUNE 100 company, that commitment to the bigger picture has never wavered." When it comes to Collaboration, Diversity & Inclusion, "They are more than business initiatives. They are a way of life reaching far beyond corporate and social responsibility". Again, Mr. Niblock trumpets that "At the core of this commitment are people-people with diverse backgrounds and ideas, people with a desire to blaze new trails and people who know that their diverse perspectives are valued and appreciates." Pictures of happy employees and stories on how their sweat equity builds pride makes it all seem bucolic. Lowe's 2009 Social Responsibility Report touted the company's reputation and integrity, and it's "dedication to diversity and inclusion grows from the values of our employees and extends to every corner of our company. We draw upon the strength of collaboration, bringing together many unique individuals in the workplace and the community to achieve our goals." ... "Lowe's goal is to treat each customer, coworker, community, investor and vendor with respect and dignity, and to offer each employee the opportunity to build a career. It's how we come together that sets us apart."

35.      During her tenure, Plaintiff did not enjoy such a bucolic atmosphere or adherence to such high minded principles. Instead she was forced to suffer a discriminatory and illegal workplace where she was made an example of based on her sex, race, disability and medical condition, and retaliated against for asserting her rights. Her work days were comprised of suffering one humiliation after and other that reached to the extent of management insisting that she clean up a soiled ladies room.

Plaintiff filed an administrative claim, and the EEOC sent her a right-to-sue letter on March 31, 2014.

10

## STATEMENT OF CLAIMS

### COUNT I.

### RACIAL, SEXUAL DISCRIMINATION and RETALIATION IN VIOLATION OF TITLE VII

36.     Plaintiff incorporates by reference herein Paragraphs 1 through 35 of this Complaint as though set forth here in full.

37.     Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000, *et seq* as amended by the Civil Rights Act of 1991 ("Title VII), makes it unlawful to discriminate against any individual in the terms, conditions, or privileges of employment on the basis of race, gender or sex.  Plaintiff was a black female employee of Defendant's.

38.     Based upon the foregoing facts, Defendant has subjected Plaintiff to an illegal working environment, has discriminated against Plaintiff on the basis of her race and sex, and has retaliated against her, thus depriving her of her rights in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et. seq.*

39.     Defendant is liable for the discrimination alleged herein, assuming liability pursuant to Title VII with respect to Plaintiff.  Defendant is strictly liable for the acts of its supervisory employees because said employees used actual or apparent authority to further the unlawful conduct, otherwise aiding in accomplishing the unlawful conduct by the existence of an agency relationship.

40.     Defendant  is liable for the acts alleged herein because Defendant's top corporate echelon, despite the pretty verbiage, established and permitted the corporate culture which encouraged favoritism for some and discrimination and harassment for others, including discrimination against Plaintiff on account of her race and sex.

11

41.   The hostile work environment was sufficiently severe and pervasive such that it altered the condition of Plaintiff's employment, affected the terms, conditions and privileges thereof all in violation of Title VII, resulting ultimately in Plaintiff's discharge from employment.

42.   Based upon the foregoing, Defendant has discriminated and retaliated against Plaintiff on the basis of her race and sex, retaliated against her based on her EEO-related complaints, and otherwise deprived her of her rights in violation of Title VII.

43.   As a result of such conduct by Defendant, Plaintiff has suffered damages and is entitled to back pay, front pay, and compensatory damages for, among other things, emotional trauma and the physical consequences thereof suffered by her as a consequence of Defendant's illegal conduct.

44.   The described unlawful employment practices by Defendant were intentional and were done with malice or reckless indifference to Plaintiff's rights protected by the laws of the United States, as well as the laws of the Commonwealth of Virginia.  These unlawful acts were committed because of her race and sex.  Accordingly, she is entitled to punitive damages.

45.   The effect of the aforementioned practices has been to deprive Plaintiff of equal employment opportunities and adversely affect her status as an employee because of her race and sex.

### COUNT II

### DISCRIMINATION ON ACCOUNT OF DISABILITY IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT

46.   Plaintiff realleges paragraphs 1 to 45 and incorporates them by reference as paragraphs 1 to 21 of Count I of this Complaint.

47.   The Americans with Disabilities Act, as amended (42 U.S.C. §12101 et seq.) ("ADA"), makes it unlawful to discriminate against any individual due to physical or mental

12

impairment.

48.     At the time of her firing, Plaintiff was physically impaired and disabled within the meaning of the ADA.  The ADA Amendment Act of 2008 ("ADAAA") which went into effect on January 1, 2009 is applicable to this matter.  Under the ADAAA, to qualify as being disabled, a plaintiff must prove one of the following: (1) a physical or mental impairment that substantially limits one or more major life activities; (2) a record of such impairment; or (3) being regarded as having such impairment. 42 U.S.C. 12102 (1) (West 2009).  As had been made clear to Defendant, Plaintiff had on record a physical impairment, namely cancer, that substantially limited one or more major life activities.

49.     Despite Plaintiff's positive work history with Defendant, Plaintiff was not accommodated in terms of her medical appointments.  To the contrary Defendant specifically tried to hinder her in getting treatment.  After the derogatory comment of being "as worthless as a goldfish with tits", Plaintiff was fired after becoming impaired or disabled, making this firing actionable under the ADA.

50.     Defendant is liable for the discrimination alleged herein, assuming liability pursuant to the ADA with respect to Plaintiff.  Defendant is strictly liable for the acts of its supervisory employees because said employees used actual or apparent authority to further the unlawful conduct otherwise aiding in accomplishing the unlawful conduct by the existence of an agency relationship.

51.     Defendant is liable for the acts alleged herein because Defendant's top corporate echelon established and permitted  the corporate culture which, despite the pretty verbiage, encouraged favoritism for some and discrimination and harassment for others, including discrimination against Plaintiff on account of her disability.

52.     The hostile work environment was sufficiently severe and pervasive such that it altered the condition of Plaintiff's employment, affected the terms, conditions and privileges thereof in violation of the ADA, resulting in Plaintiff's discharge from employment.

53.     Based upon the foregoing, Defendant has discriminated against Plaintiff on the basis of his disability, failed to accommodate for such disability, and otherwise deprived him of his rights in violation of the ADA.

54.     As a result of such conduct by Defendant and its agents, Plaintiff has suffered damages and is entitled to back pay, front pay, and compensatory damages as a consequence of Defendant's illegal conduct.

55.     Because Defendant's discriminatory treatment of Plaintiff was willful and/or in reckless disregard of her federally-protected rights, Plaintiff is entitled to an award of punitive damages against Defendant.

**COUNT III**

**WRONGFUL TERMINATION**

56.     Plaintiff realleges paragraphs 1 to 55 and incorporates them by reference as though set forth here in full.

57.     This claim arises under the Virginia Human Rights Act ("VaHRA"). The VaHRA at 2.2-3901 makes conduct that " violates any Virginia or federal statute or regulation governing discrimination on the basis of race, color, religion, national origin, sex, pregnancy, childbirth or related medical conditions, age, marital status, or disability" an "unlawful discriminatory practice".

58.     Plaintiff is in a protected class because of her race, sex and disability.

59.     Based upon the foregoing facts, Defendant has discriminated against Plaintiff on the basis of her race, sex, disability and medical condition and has deprived her of her rights in violation of the Va. HRA.  Her termination violated public policy on these grounds, and was also retaliation of her EEO-related complaints.

60.     As a result of such conduct by Defendant, Plaintiff has suffered damages and is entitled to back pay and attorney's fees.

## COUNT IV

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

61.     Plaintiff restates and realleges paragraphs 1 through 60 as though set forth here in full.

62.     The Virginia common law provides for the tort of intentional infliction of emotional distress.  The common law of intentional infliction of emotional distress requires proof of willful or reckless conduct of such an outrageous character as to cause severe emotional distress.  "To prevail a plaintiff need only prove emotional injury "so severe that no reasonable person could be expected to endure it." Russo v. White, 241 Va. 27, 197 S.E. 2d 160, 163

63.     Defendant's deliberate and outrageous conduct as described hereinbefore has subjected Plaintiff to severe emotional distress.

64.     With respect to Plaintiff's allegations, Defendant as the employer, is strictly liable for the acts of the supervisory management employees, because the harassers and those who caused Plaintiff's emotional distress used their actual or apparent authority to further the unlawful conduct, and were otherwise aided in accomplishing the unlawful conduct by the existence of an agency relationship.

15

65.   Defendant is liable for the acts of management and co-workers of Plaintiff because it deliberately failed to follow proper complaint procedures and investigate Plaintiffs' complaints at the time they were made.

66.   Defendant is liable for the acts alleged herein because Defendant's executives, managers and supervisors established the corporate culture which encouraged the improper behavior directed at Plaintiff.

## RELIEF REQUESTED

67.   Plaintiff restates and realleges paragraphs 1 through 66 as though set forth here in full.

68.   This civil action seeks on behalf of Plaintiff, legal and equitable relief including:

a.   Back and front pay for Plaintiff and payment of compensatory damages (including in lieu of reinstatement) and punitive damages, together with attorney's fees and the costs of suit to Plaintiff in excess of $150,000, in an amount to be determined at trial pursuant for each of her Federal, State and County civil rights counts pursuant to federal, state and County law.

b.   Payment of compensatory and punitive damages together with attorneys fees and the costs of suit to Plaintiff for the harm suffered by Plaintiff as a result of Defendant's intentional infliction of emotional distress.

c.   Such other and further relief as the Court may deem just and proper.

d.   Retention of jurisdiction by this Court until such time as the Court is satisfied that Defendant has remedied the practices complained of herein and is determined to be in full compliance with the law.

## **JURY DEMAND**

The Plaintiff demands trial by jury of all issues triable of right to a jury.


Dated : June 23, 2014

George Doumar, Esquire
Doumar Martin PLLC
2000 North 14th Street, Suite 201
Arlington, VA 22201
Telephone: 703 243-3737

Email:gdoumar@doumarmartin.com
VA. Bar No. 26490


OF COUNSEL:

/s Mark D. Schwartz
Mark D. Schwartz, Esquire *
P.O. Box 330
Bryn Mawr, PA 19010-0330
Telephone & Fax: 610 525-5534

Email: MarkSchwartz6814@gmail.com
Pa. I.D. #30527

Attorneys for Plaintiff
    Diane Almond-Ward

- To be admitted Pro Hac Vice

17